# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JANICE HOLDER,                          )
                                        )
        Plaintiff,                     )       No. 3:11-cv-00571
                                        )       Judge Haynes
v.                                      )
                                        )
UNITED OF OMAHA LIFE INSURANCE          )
COMPANY,                                )
                                        )
        Defendants.                    )

## M E M O R A N D U M

Plaintiff, Janice Holder, filed this action under the Employees Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against the Defendant, United of Omaha Life Insurance Company, the Administrator of Plaintiff's employee benefit plan. Plaintiff seeks judicial review of the Defendant's denials of short term disability ("STD") and long term disability ("LTD") benefits under insurance policies issued to Plaintiff's former employer, Shipper's Transport Company. The Defendant filed the Administrative Record ("AR") of its reviews of Plaintiff's disability claims. (Docket Entry No. 11).

Both parties have moved for judgment in their favor. In her motion for judgment on the administrative record (Docket Entry No. 21), Plaintiff contends, in sum: (1) that Plaintiff is disabled under the terms of the policy; (2) that Defendant's exclusive reliance upon the opinions of non-examining file reviewers is inadequate to provide a reasoned explanation for its decision to deny disability benefits; and (3) that the policy provides for payments for up to two years for disabilities due to self-reported symptoms. In its motion for judgment on the administrative record (Docket

Entry No. 19), the Defendant contends, in essence, that its decision denying benefits was rational in light of the plan provisions and is supported by substantial evidence.

For the reasons set forth below, the Court concludes that Defendant's decisions to deny Plaintiff long term and short term disability benefits under the Plan was based upon Plaintiff's medical records and the diagnoses and opinions of Plaintiff's treating physicians. Thus, the Defendant's decisions were not arbitrary and capricious.

## I. Review of the Record

### A. The Employment Relationship

From March 2006 to February 17, 2009, Plaintiff was a safety director for Shipper's Transport Company with responsibilities for handling Department of Transportation and OSHA compliance as well as investigating accident sites and shipping terminals. (Docket Entry No. 11, at AR 827-29). As part of her job, Plaintiff was required to travel approximately 40 percent of the work time by car and commercial airline. Id. at AR 828.

During her employment, Plaintiff suffered episodes of syncope, or fainting spells approximately once a month. (Docket Entry No. 22 at 2). Plaintiff also suffers from a rheumatological impairment, variously diagnosed as lupus, fibromyalgia, and myofascial pain disorder. Id. Plaintiff contends that because the "diagnostic criteria and treatment for many rheumatological conditions overlap, [her] condition has evaded a clear diagnosis." Id.

Shippers Transport has an employee welfare benefit plan (the "Plan") providing STD and LTD benefits to eligible employees. The definition of Disability under both the STD and the LTD plans provides that if an "Injury or Sickness" establishes a disability if the employee has:

-2-

a significant change in Your mental or physical functional capacity [and] You are:

(a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
(b) unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

After a Monthly Benefit has been paid for 2 years, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation.

(Docket Entry No. 11, at AR 580).

To receive STD or LTD payment, a claimant must provide Defendant with acceptable proof of disability: "Benefits will be paid monthly after We receive acceptable proof of loss." Id. at AR 571. A claimant must also satisfy an Elimination Period:

**Elimination Period** means the number of days of Disability which must be satisfied before You are eligible to receive benefits. The elimination period is shown in the Schedule. The elimination period begins on the first day of Disability.

Id. at AR 581.

The Defendant reserves the authority and discretion to make eligibility determinations for benefits and interpret the terms of the Plan under both STD and LTD:

**Authority to Interpret Policy**

The Policyholder has delegated to Us the discretion to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy. Benefits under the Policy will be paid only if We decide, after exercising Our discretion, that the Insured Person is entitled to them. In making any decision, We may rely on the accuracy and completeness of any information furnished by the Policyholder, an Insured Person or any other third parties.

Id. at AR 579.

The LTD policy further contains a limitation for Self-Reported Symptoms that provides:

-3-

> If Your Disability is primarily based on Self-Reported Symptoms, Your benefits will be limited to 24 months while You are insured under the Policy . . .
>
> **Self-Reported Symptoms** means the manifestation of Your condition which You tell Your Physician that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine.

Id. at AR 569.

### B. Holder's Medical History

In 2007, Dr. David Gibson, a Cardiologist, treated Plaintiff for accelerated chest pain syndrome, noting that Plaintiff had a long history of lupus erythematosus, migraine headache and fibromyalgia. Id. at AR 210. Dr. Gibson performed an echocardiogram that revealed normal echocardiographic response. Id. Plaintiff nevertheless underwent a cardiac catheterization. Id. The left heart catheterization revealed normal coronary autonomy. Id. at AR 211, 208. Dr. Gibson concluded "the etiology of her symptoms is unclear," and referred her to Dr. Eli Steigelfest, a rheumatologist, for further evaluation, as to fibromyalgia and chronic chest pain. Id. at AR 173.

On October 13, 2008, Plaintiff visited Dr. Robert Snyder, an orthopedist, with complaints of back pain. Id. at AR 103-04, 111. Dr. Snyder concluded that Plaintiff had minimal loss of motion, noting that "[i]maging studies of the thoracolumbar spine demonstrate no significant bony abnormalities with minimal degenerative disease." Id. Dr. Snyder recommended MRIs of the lower thoracic spine and lumbar spine. Id. The MRI of Plaintiff's thoracic spine was unremarkable except for a hemangioma or fatty rests confined to T9 and multiple smaller hemangiomas in other vertebrae. Id. at AR 109. Similarly, the MRI of Plaintiff's lumbar spine only revealed "[m]iniscule central L1-2 disc protrusion without neural impingement" and "[m]inimal L4-5 facet joint degenerative changes." Id. at AR 110.

-4-

On October 21, 2008, Dr. Snyder informed Plaintiff about the "small disc rupture at L1-2," that was consistent with her symptomatology and referred her to physical therapy. Id. at 102. Plaintiff's "Physical Therapy discharge Summary," dated November 14, 2008, reflects that Plaintiff did not respond well to therapy, but had some decrease in lower back pain. Id. at AR 108. Plaintiff, however, continued to complain of lupus erythematosus pain and had difficulty with prolonged sitting, rising and lifting. Id. The physical therapist noted that Plaintiff "partially met all treatment goals due to partial compliance with therapy program," and stated that "no discharge instructions were provided," because Plaintiff "did not return to treatment as advised." Id.

On January 29, 2009, Dr. Steigelfest examined Plaintiff who reported that Plaquenil was providing relief for her autoimmune related pain. Id. at AR 140. Dr. Steigelfest stated that Plaintiff's fibromyalgia score ("FMS") was 10/18 without proximal or distal weakness. Id. Dr. Steigelfest recommended Plaintiff try Neurontin and to return in three months. Id. at AR 141.

On February 10, 2009, Dr. Robert J. Berkompas, Plaintiff's primary care physician examined Plaintiff for her complaints of edema, palpitations, right arm pain, and nausea. Id. at AR 273. Dr. Berkompas reported that Plaintiff was fine with edema or swelling that was caused by the retention of fluid, and that her heart rate and rhythm were normal without rub, gallop, or murmur. Id. at AR 273-74. Dr. Berkompas scheduled an echocardiogram that was within normal limits except for minimal mitral regurgitation and a small pericardial effusion. Id. at AR 274, 132-133. Dr. Berkompas suspected she needed her thyroid medication adjusted, "but found no other clear-cut unifying diagnosis." Id. at AR 274.

On February 18, 2009, Plaintiff stopped working and visited Catherine Hayden, board certified Family Nurse Practitioner, with complaints of palpitations, arm pain, ankle swelling, and

-5-

dizziness. Id. at AR 120, 122, 529. Hayden completed an Attending Physician's Statement for Plaintiff's STD claim. Id. at AR 530. Hayden diagnosed Plaintiff with "near syncope spells," noting Plaintiff's symptoms as "swelling in feet," "heart racing-fluttering," "R shoulder + arm pain," and "rear syncopal feeling." Id. Hayden stated that Plaintiff should be able to return to work full-time within 1-3 months. Id. Hayden did not impose any functional limitations. Id.

On February 24, 2009, Plaintiff returned to Dr. Gibson with complaints of recurrent chest discomfort. Id. at AR 167. Dr. Gibson noted that Dr. Berkompas "did an initial evaluation with no significant abnormalities,"; that Plaintiff's "echocardiography demonstrated well-preserved biventricular function with no significant valvular heart disease,"; and that Dr. Berkompas noted a small pericardial effusion. Id. at AR 167. Dr. Gibson prescribed Plaintiff amlodipine 2.5 mg daily with instructions to return in two to three weeks. Id. at AR 168.

On a return visit on April 7, 2009, Dr. Gibson noted that Plaintiff "has had very infrequent paroxysms of atypical chest discomfort." Id. at AR161. Plaintiff's cardiovascular examination reflected a "regular rate and rhythm with normal heart sounds" without murmur, rub, or gallop. Id. at AR 162. Dr. Gibson stated Plaintiff "appears to remain free of overt anginal type chest discomfort" and "improved with the empiric initiation of Amplodipine." Id. Dr. Gibson recommended further upward adjustment of her Amlodipine to 5 mg daily and instructed her to return in two weeks. Id.

Plaintiff returned to Dr. Gibson's office on April 21, 2009 with her reports of "marked improvement of chest discomfort episodes" and that she walks "a lot." Id. at AR 153, 156. Dr. Gibson noted that the increased dosage of Amlodipine caused Plaintiff to experience symptoms of

-6-

orthostasis and hypotension. Id. at AR 153-54. Dr. Gibson lowered her dose of Amlodipine to 2.5 mg and instructed Plaintiff to return on a semiannual basis or as symptoms warranted. Id. at AR 154.

On April 22, 2009, Plaintiff returned to Hayden, the nurse practitioner to discuss her heart condition, lupus, fibromyalgia and requested that her thyroid levels be checked. Id. at AR 118. Plaintiff also requested a note for her LTD claim. Id. Plaintiff reported that her fibromyalgia was worse, but Hayden only found tender points in Plaintiff's shoulders, chest, low back, and knees. Id.

On May 6, 2009, Plaintiff returned to Dr. Steigelfest's office for a follow-up visit. Id. at AR 136. Contrary to his previous orders, Plaintiff had not filled her Neurontin prescription. Id. Upon examination, Plaintiff's FMS score was 8/18 with no proximal or distal weakness. Id. On her "certificate for return to work," Dr. Steigelfest remarked that Plaintiff would be "able to return to work on '?'". Id. at AR 139.

### C. Plaintiff's Initial Claims Process

Plaintiff filed her claim of disability on February 19, 2009. Id. at AR 529. Shippers Transport Company went out of business on Friday, February 20, 2009. Id. at AR 698. After Plaintiff filed her STD claim in February 2009, Defendant had a Nurse Case Manager review Plaintiff's file. Id. at AR 869-71. On May 11, 2009, Lori Huertz, a registered nurse, concluded:

> Medical records are sufficient to support [restrictions and limitations] to the 4/21/09 office visit with her cardiologist while she was being evaluated for angina and medications were being adjusted. She does not have to follow-up with cardiology for 6 months which indicates her cardiac status is considered stable. Her main complaint now appears to be related to her 6-year history of fibromyalgia and lupus. Please request most recent physical exam from the Rheumatologist, Dr. Steigelfest as his brief work note is not sufficient to support R/L's beyond 4/21/09. . . .

Id. at 871. Defendant awarded Plaintiff benefits up to April 21, 2009. Id. at AR 1035.

In a letter dated May 20, 2009, Hayden informed Defendant that Plaintiff had not improved since her last visit. Id. Hayden noted that Plaintiff's fibromyalgia's symptoms were worse and that she suffered from lupus and printzmetal's angina. Id. Hayden opined that all of Plaintiff's conditions would worsen if she went back to work because these symptoms are exacerbated by the stress of her job. Id. Hayden further opined that Plaintiff would be able to return to work in July if she were improved at that point. Id.

After receipt of additional medical records, Defendant submitted Plaintiff's file to another Nurse Case Manager for review. Id. at AR 867. On June 11, 2009, Linda Rashchke, a registered nurse, concluded that the "[m]edical information do[es] not support the continued restrictions and limitations from 4/21/2009 to the end of STD coverage . . . . It has not been demonstrated that claimant is unable to perform her job duties such as occasionally lift/carry small objects, lift a maximum of 10 pounds with occasional walking or standing." Id. Despite her travel, on Plaintiff's STD claim form, Plaintiff's employer classified Plaintiff's position as a sedentary occupation. Id. at AR 529. Rashchke noted that Plaintiff's job description was not available for review. Id.

Defendant denied Plaintiff STD benefits beyond April 21, 2009, concluding that Plaintiff's medical records did not support her inability to perform her regular job duties on a part time or full time basis after April 21, 2009. Id. at AR 1027-29. Defendant informed Plaintiff of the appeal process and allowed Plaintiff to submit additional records for her appeal. Id. at AR 1027-28.

Pending her appeal, on July 29, 2009, Plaintiff visited Dr. Snyder with complaints of back pain. Id. at AR 100. Dr. Snyder's examination revealed that Plaintiff's range of motion in her back was normal, but extension caused some pain in Plaintiff's left hip. Id. Dr. Snyder "suggested that she not do much bending if she can avoid it but otherwise, full activity." Id.

-8-

At her six-month follow-up with Dr. Gibson on October 26, 2009, Plaintiff reported that her episodes of tachypalpitations or irregular heart beats were improved "over those experienced prior to initiation of amlodipine." Id. at AR 73. Plaintiff "had no recurrent severe anginal type chest pain." Id. According to Plaintiff, she was walking six times per week. Id. at AR 76. Dr. Gibson concluded that Plaintiff was "intolerant to further maximization of medical therapy at present," and ordered annual check-ups. Id. at AR 74.

On December 8, 2009, Plaintiff appealed the denial of her STD claim, and on January 5, 2010, Defendant referred Plaintiff's file to a Nurse Case Manager for review. Id. at AR 862-64. Nancy Rosenstock, a registered nurse, provided a summary of Plaintiff's medical records and opined that the "[o]verall medical documentation appears to be lacking objective physical and diagnostic findings, from any of claimant's attending physicians [Cardiologist, Rheumatologist, Family Medicine and Orthopedics] to support physical restrictions and limitations which would preclude her from performing in a sedentary work capacity [usually requires sitting up to 6 hours out of an 8 hour day and lifting up to 10 lbs, per Department of labor/DOL guidelines]." Id. at AR 864.

On January 12, 2010, Defendant denied Plaintiff's appeal concluding that "the medical evidence in her file does not reveal restrictions and limitations preventing her from performing the material duties of her regular job." Id. at AR 1019. For its conclusion, the Defendant cited its review of Plaintiff's medical records.

> Ms. Holder has a history of cardiac catheterization performed July 27, 2007. Dr. Gibson indicated she tolerated the procedure without complication. She had a normal left ventricular function with mild elevation of the left ventricular end diastolic pressure. Normal coronary anatomy was delineated. He notes Ms. Holder may warrant noncardiac work-up for chest pain if persistent in nature; however, no additional cardiac testing is warranted.

-9-

She presented to the Saint Thomas Hospital emergency room July 28, 2007 for evaluation of some nausea in the morning with unilateral headache consistent with her usual migraine syndrome. She was treated with Compazine and Benadryl intravenously which completed resolved her symptoms. She was discharged with the impression of post catheterization femoral pain without evidence of acute complications; migraine headache, anxiety.

Her MRI of the thoracic spine revealed hemangioma-confined to the T-9 vertebral body. Multiple smaller hemangiomas or fatty rests in other vertebrae; otherwise, unremarkable. Her MRI of the lumbar spine revealed minuscule central L1-2 disc protrusion without neural impingement and minimal L4-5 facet joint degenerative changes.

Ms Holder continued to complain of difficulty with rising, bending and lifting on the date of discharge from physical therapy on November 14, 2008. She reported having less lower back pain and feeling a little better; however, lower extremity pain is unchanged. The assessment revealed she was not responding well to therapy as she continued to complain of lower extremity pain and difficulty with prolonged sitting, rising, lifting; however, she noted decreased lower back pain. Discharge goals were partially met due to partial compliance with the therapy program. She did not return for treatment as advised; therefore; no discharge instructions were given to Ms. Holder.

Her echocardiogram on February 12, 2009 concluded her overall left ventricular systolic function was within normal limits, there was minimal mitral regurgitation, and there was a small pericordial effusion.

She presented to Dr. Gibson April 21, 2009 for follow-up after intensification of amiodipine for presumed coronary vasospasm. With titration from 2.5 mg to 5 mg daily, she has had symptomatic orthosiasis and symptoms of hyportension. She noted marked improvement of chest discomfort episodes and denies orthopnea, PND, peripheral edema, or symptomatic palpitations. With the development of symptoms, she returned to the lower dose of amiodipine at 2.5 mg daily with better tolerability. Her cardiovascular physical examination demonstrates regular rate and rhythm with normal heart sounds with no murmur, rub, or gallop. Dr. Gibson advised her to stay at 2.5 mg daily and to return to Dr. Berkompas for ongoing medical care.

A work excuse slip completed by Dr. Steigelfest on May 6, 2009 indicated Ms. Janice Holder "has been under my care from March 2, 2009 to July 31, 2009 and is able to return to on ?"

A letter from Catherine Hayden, FNP dated May 20, 2009 indicates Ms. Holder was re-evaluated April 22, 2009 and has not improved since her last visit as her

-10-

fibromyalgia symptoms arc worse and also suffers from lupus and has Printzmetal's angina. She states these symptoms are worsened by stress and her job is very stressful. She states Ms. Holder will be able to return to work if she improved. Her next appointment is in July.

Ms. Holder presented to Dr. Snyder on July 29, 2009 complaining of continued pain when she bends over. The physical examination revealed left S1 joint tenderness with no swelling, redness, or heat. Range of motion of her back was normal including flexion and extension; however, extension caused some radiating pain to her left hip. Dr. Snyder reviewed the MRI and noted degenerative changes at 4-5 which may be consistent with some of the symptoms and suggested that Ms. Holder avoid bending; otherwise, full activity. Dr. Snyder injected the left S1 joint with 30 mg of Depo-Medrol and 1 cc or 1% lidocaine. She tolerated the procedure well and noticed relief.

She presented to Catherine Hayden, FNP on July 30, 2009 with complaints of headache, ears and nose hurting, heart racing, and feeling a heaviness in her chest. Ms. Holder reported she has had a sinus infection for a week and had been taking Sudafed and Tylenol Sinus, which Ms. Hayden advised. may be the reason for her heart racing. Her cardiac examination revealed normal sinus rhythm and regular rate and rhythm.

She presented to Dr. Steigelfest on August 13,2009 for a follow-up visit. He-noted she did better after the Sl joint injection and her knee was doing well. He noted she reported more episodes of fatigue while taking Gabapentin, which helped alleviate pain. She stopped taking plaquenil and did not notice a difference. Her physical examination revealed right knee crepitus; muscle tenderness 8/18; no proximal weakness; no distal weakness; and no atrophy. She was advised to continue Lexapro, decrease neurontin, could try arthrotec 50 mg twice a day and to re-evaluate in 3 months.

While we acknowledge that Catherine Hayden, FNP believes Ms. Holder is disabled, the medical evidence on file does not reveal restrictions and limitations preventing her form performing the material duties of her regular job. Although[] she has [undergone] comprehensive cardiac testing with Dr. Gibson, those findings appear unremarkable. A cardiac catheterization July 27, 2007 demonstrated normal left ventricular function with normal coronary anatomy. She also had a normal left ventricular ejection fraction of 62%. The echocardiogram on February 12, 2009 revealed a normal left ventricular systolic function and the ejection fraction was estimated to be over 65%. She demonstrated regular rate and rhythm with normal heart sounds with no murmur, rub or gallop at the most recent office visit with the cardiologist. Although Catherine Hayden, FNP indicated Ms. Holder's fibromyalgia symptoms were worse and suffered from lupus and Printzmetal's angina, her cardiologist did not note this condition (Printzmetal's angina) in his records. Dr.

-11-

Snyder's noted left S 1 joint tenderness with no swelling, redness, or heat with normal range of motion of her back to include flexion and extension. Although Dr. Steigelfest references Ms. Holder's history of fibromyalgia, osteoarthritis, and positive ANA, her records in file do not identify when these conditions were initially diagnosed. The records in file lack any recent laboratory studies to confirm the presence of an elevated ANA. He noted she did better after the S1 joint injection and her knee was doing well. The medical records in file suggest a conservative treatment plan to include Lidoderm pain patches; muscle relaxants; neurontin; and anti-depressant.

Id. at AR 1018-20. In sum, the Defendant concluded, "[T]he documentation in her file does not support any cognitive or functional impairment that would have prevented her from performing the material duties of her regular job, and does not support a disability." Id. at AR 1020.

### D. Plaintiff's Post Denial Medical Treatment

On January 25, 2010, Plaintiff visited Dr. Berkompas for a wellness exam. Id. at AR 56. Plaintiff complained of frequent palpitations and reported lost consciousness without explanation. Id. Upon examination, Dr. Berkompas found that Plaintiff's heart had a regular rate and rhythm with normal PMI and without noticeable rub, gallop, or murmur. Id. at AR 57. Plaintiff's laboratory tests were back unremarkable "except for an indication that [her] thyroid dose is a bit too high." Id. at AR 66. Dr. Berkompas opined that the thyroid imbalance could be "contributing to the palpations" that Plaintiff experienced and thus, decreased her dosage. Id.

On February 8, 2010, Plaintiff returned to Dr. Gibson for recurrent episodes of intermittent palpitations and lightheadedness. Id. at AR 803. Dr. Gibson noted Plaintiff "has had a great deal of psychosocial stress ongoing and over the last 3-4 months." Id. Plaintiff reported that "[s]he regularly exercises with light weightlifting and treadmill exercise 2-3 times per week." Id. A physical examination revealed Plaintiff had regular heart rate and rhythm without murmur, rub, or gallop. Id. at AR 804. Dr. Gibson recommended a 21-day event recorder. Id. After Plaintiff's

-12-

February 8, 2010, Defendant, Dr. Gibson submitted the results of the study to the Defendant that "there were no physical exam abnormalities and no evidence of coronary artery disease." Id. at AR 710.

On February 12, 2010, Hayden, Plaintiff's family nurse practitioner, filled out another medical opinion form, stating:

> Patient has lupus, fibromyalgia and osteoarthritis causing considerable muscle [and] joint pain. Two-three days per week she is unable to get out of bed. She has carpal tunnel in her [right] wrist which limits her ability to type. She has been having syncopal spell[s] which a cardiologist is investigating–she is currently wearing a heart monitor for 21 days. She has migraine headaches 3-4 times per month. She also has irritable bowel syndrome and asthma.

Id. at AR 70, 72. Hayden further concluded that Plaintiff could occasionally lift/carry 1-10 lbs., infrequently lift/carry 11-20 lbs., and never lift/carry more than 20 lbs. Id. at AR 70. Plaintiff could occasionally (1/3 of work day) fine manipulate, type, write, and grasp small objects. Id. at AR 71. Plaintiff could sit for 3 hours out of an 8 hour day for 30 minutes at a time and stand or walk 2 hours out of an 8 hour day for 30 minutes at a time. Id. at AR 70. Hayden also reported that Plaintiff requires 2 hours of bed rest during the day. Id.

On February 16, 2010, Plaintiff returned to Dr. Steigelfest. Id. at AR 785. Dr. Steigelfest reported that "Gabapentin still seems to be helping pains even at lower dosage taking at night and helps with sleep and feels more like herself." Id. Plaintiff rated her pain at an 8/10 with her left shoulder hurting the worst. Id. Plaintiff's FMS score was 8/18 with no proximal or distal weakness or atrophy. Id. Dr. Steigelfest directed Plaintiff to return in three months. Id. at AR 786.

In a letter dated February 16, 2010, Dr. Steigelfest described Plaintiff's condition, as follows:

> Ms. Holder stays in moderate to severe pain and has an average fatigue rating of 9 on a scale of 1 through 10 with 10 being the most severe. Comparing this year, 2010, to

-13-

the first year of her becoming my patient [November 3, 2004], her pain and fatigue have increased with time. As Ms. Holder ages, I expect this trend to continue.

Ms. Holder has days that she is incapacitated. These events can last from one day to three or four days concurrently. Other days, she requires bed rest of at least two hours after any three to four hours of activity.

She is limited on the types of physical activity she can perform in any employment position. Triggers such as stress, cold, sitting or standing for over 2 hours, and numerous other factors will increase her pain and fatigue level and lessen her ability to perform any activity satisfactorily.

Based on these events combined with other health conditions of the patient, Ms. Holder has and will in all probability continue to have excessive absences (greater than 5 days per month) from employment due to sickness, physician appointments, and medical testing.

Id. at AR 55.

On June 11, 2010, Dr. Paul Rummo examined Plaintiff for back and right knee pain. Id. at AR 756-57. Dr. Rummo ordered MRIs of Plaintiff's knee and back. Id. at AR 757. The MRI of Plaintiff's right knee reflected some signal change in Plaintiff's medial meniscus. Id. at AR 753. The MRI of Plaintiff's spine showed "very minimal spondylotic changes noted throughout the lumbar spine, mild bulging at L4-L5, but nothing significant." Id. Dr. Rummo prescribed physical therapy. Id.

On June 23, 2010, Plaintiff attended physical therapy and reported that prior to her knee pain, she was "[r]etired and currently leads an active lifestyle including exercising regularly on treadmill and strengthening program at home as well as enjoys gardening and completes household chores." Id. at AR 749.

-14-

Plaintiff returned to Dr. Steigelfest's office on August 16, 2010, reporting that the Gabapentin was still helping with better sleeping and decreased her pain to a 7 on a scale of 10. Id. at A.R. 781. Plaintiff's FMS score was 5/18 without proximal or distal weakness. Id.

On August 23, 2010, Plaintiff returned to Dr. Rummo who referred Plaintiff to Dr. James Carey for possible surgical arthroscopy on her right knee due to her continued pain. Id. at AR 744. Dr. Carey recommended a right knee arthroscopy. Id. at AR 740.

Upon referral, Dr. Thomas McRae, III, a cardiologist examined Plaintiff on August 30, 2010. Id. at AR 679. Plaintiff's echocardiogram was normal. Id. at AR 686-88. Dr. McRae's physical examination revealed that Plaintiff had 5/5 strength in her upper and lower extremities without murmurs, rubs, or gallops. Id. at AR 680. Dr. McRae reported that Plaintiff's EKG was normal, stating that: "statistically it is unlikely for her to develop coronary artery disease in the interval three years particularly since she has had a normal nuclear test, but given the severity of her symptoms we have literally no other choices other than to do a left heart catheterization." Id.

On September 28, 2010, Dr. Steven Graham, a neurologist examined Plaintiff for chest and leg pain. Id. at AR 674. Dr. Graham observed that Plaintiff was "in good overall condition." Id. Plaintiff's speech, cognition, cranial nerve, motor, sensory, coordination, walking, and reflexes were normal. Id. Dr. Graham reported that Plaintiff's "synocopal episodes quite likely [are] secondary to vasovagal syncope. Her other somatic complaints are quite varied, and do not fit any specific neuropathological pattern at this time. Clinically, I doubt if she is having transient ischemic attack or other CSN disorders." Id. at AR 674-75. Dr. Graham informed Plaintiff that she had "no specific, significant problems." Id. at AR 675.

-15-

### E. Plaintiff's Second Claims Process

On June 14, 2010, Plaintiff applied for LTD citing her pain, inability to get out of bed, and inability to drive. Id. at AR 820-29. Plaintiff attached a Physician's Statement to her LTD application that Plaintiff could not work because of fibromyalgia, osteoarthritis, lupus, and migraine headaches. Id. at AR 825-26. Plaintiff's spouse completed the Employee's portion of her LTD application. Id. at AR 698.

On October 4, 2010, Plaintiff's claim was sent for an Internal Physician Consultant medical review. Id. at AR 858. Dr. Thomas Reeder, Senior Vice President and Medical Director of United Omaha, called and wrote detailed letters to Hayden, Dr. Steigelfest, and Dr. Gibson to obtain a better understanding of Plaintiff's functional capacity. Id. at AR 707-13. Each letter stated that if Defendant did not hear back from the recipient within 10 days, Defendant would assume that they were in agreement with the assessments in Dr. Reeder's letters. Id. at AR 709, 711, 713. Defendant also followed up with these providers to ensure that he or she received the letter and had an opportunity to respond. (Docket Entry No. 14, attachment thereto, Administrative Record at 1283-94).

On October 7, 2010, Dr. Thomas Reeder, sent Dr. Steigelfest a letter requesting clarification of Plaintiff's functional status. (Docket Entry No. 11, at AR 712-13). Dr. Reeder noted that Dr. Steigelfest's assessment of Plaintiff's tender points from an 8 to 10 of 18 and asked Dr. Steigelfest if Plaintiff ever had more than 10 tender points. Id. Dr. Reeder requested Dr. Steigelfest to "respond with symptoms, physical exam findings, diagnostic tests, corroboration of activities that would support any restrictions and limitations" if he disagreed. Id. Dr. Stiegelfest confirmed receipt of Dr. Reeder's letter, but he would not respond because he did not make any disability evaluations and

-16-

suggested the Defendant should refer Plaintiff for a functional capacity examination for "a better understanding of Plaintiff's condition." (Docket Entry No. 14-1 at AR 1285, 1287).

On October 11, 2010, Dr. Reeder sent Dr. Gibson a letter confirming their recent telephone conversation that Plaintiff's "chest pain was of noncardiac nature" and their agreement that with her cardiac condition, Plaintiff "would have no work restrictions including driving." (Docket Entry No. 11, at AR 710-11).

On October 21, 2010, Dr. Reeder wrote Hayden with his analysis of Plaintiff's medical records and assessments. Id. at AR 707-09. Dr. Reeder cited his review of Plaintiff's medical records from Dr. Gibson, Dr. Steigelfest, Dr. Snyder, Dr. Berkompas, Dr. Fakhruddin, Dr. Butler, Dr. Rummo, and Dr. Carey. Id. at AR 707. Dr. Reeder opined that these medical records did not support restrictions and limitations that precluded Plaintiff from returning to her sedentary occupation:

> None of the records revealed physical exam or diagnostic test abnormalities documenting functional impairment that would prevent Ms. Holder from working in her sedentary occupation. Ms. Holder does not meet the American College of Rheumatology criteria for the diagnosis of fibromyalgia, rheumatoid arthritis, or systemic lupus erythematosus. There is no documentation of weakness, impaired range of motion, or functional loss that would preclude work. There is no documentation of cognitive impairment by clinical examination, abnormal Mini Mental State Examination, or neuropsycbological testing. There is no evidence of arrhythmia, coronary ischemia, or impaired cardiac function. There is no evidence of thyroid dysfunction. Ms. Holder has been on thyroid replacement with normal TSH levels except for one occasion. There is no documentation of headaches of such severity and frequency that they require emergent treatment. There is no evidence of impaired lung function. She had excellent exercise tolerance during the cardiac stress test and no evidence of cardiac disease by cardiac catheterization. There is no documentation of carpal tunnel syndrome by clinical examination or abnormal nerve conduction study. Ms. Holder's 2/18/09 health history recorded an incredible number of complaints suggesting extreme preoccupation with her symptoms. Although Ms. Holder is preoccupied by her symptoms and appears to have a component of anxiety there is no evidence that this is an impairing condition. Ms. Holder has not been

-17-

evaluated by a psychiatric professional and has been maintained only on low dose psychotropic medication.

Id. at AR 708-09. Dr. Reeder concluded the absence "in the extensive records that would support work restrictions that would preclude work or support discontinuing work in February 2009." Id. at AR 709. Dr. Reeder requested Hayden to submit "any information with physical exam findings, diagnostic tests, and evidence to support work restrictions . . . and limitations." Id. On November 23, 2010, Hayden's office informed Defendant that Hayden would not be responding because she agreed with the letter. (Docket Entry No. 14-1, at AR 1294).

On October 21, 2010, after reviewing additional records submitted by Plaintiff from Dr. Rummo, Dr. Carey, and Dr. Fakhruddin, Dr. Reeder also noted that "[t]here were no restrictions or limitations from Drs. Rummo and Carey." (Docket Entry No. 11, at AR 859, 860). Dr. Reeder concluded that "[t]here is no evidence of focal neurological impairment in several orthopedic examinations by Drs. Rummo and Carey" and "[t]here is evidence of degenerative change in the right knee that would not impact sedentary work." Id. at 860.

On December 1, 2010, Dr. Reeder reported that: "FNP Hayden's office indicated she agreed with my 10/21/10 letter. I spoke with Dr. Gibson who suggested there were no cardiac restrictions and limitations including driving. Dr. Steigelfest verbally suggested a Functional Capacity Evaluation." Id. at 855. Dr. Reeder's conclusions from his review of Plaintiff's medical records were:

> -There is no evidence of focal neurological impairment in several orthopedic examinations by Drs. Rummo and Carey.
> -There is evidence of degenerative change in the right knee that would not impact sedentary work.
> -The Insured does not meet the American College of Rheumatology criteria for the diagnosis of fibromyalgia or rheumatoid arthritis.

-18-

-There is no evidence of weakness, impaired range of motion, or functional loss that would preclude work.
-There is no evidence of cognitive impairment.
-There is no evidence of significant arrhythmia, coronary ischemia, or impaired cardiac function.
-There is no evidence of thyroid dysfunction. The Insured has been on thyroid replacement therapy with normal or nearly normal TSH levels.
-There is no record of severe headaches requiring emergent treatment.
-There is evidence of symptom pre-occupation and anxiety, but there is no evidence of an impairing psychiatric condition. A psychiatric professional has not been consulted and she has been maintained on a low dose of an antidepressant.

Id.

On December 20, 2010, Defendant denied Plaintiff's LTD claim explaining that Plaintiff's medical records did not provide evidence of her incapablity of working in a sedentary occupation:

Since the medical records do not support any restrictions or limitations in regards to a Sedentary occupation, our Physician Director sent a letter to Dr. Steigelfest, Dr. Gibson and Catherine Hayden, FNP in an attempt to gain a better understanding of your conditions. He outlined his medical opinion from the medical records and stated that you have the capacity to work in a Sedentary occupation. He asked that they respond with any further supporting documentation and to attach any missing medical information in regards to your conditions. Dr. Steigelfest called said he was not going to respond. Dr. Gibson confirmed that he did receive the letter but we did not hear back from him. Catherine Hayden, FNP did receive the letter and she agreed with our assessment.

Medical records indicate that you have a history of chest pain, osteoarthritis of the knee, migraine headaches, back pain and fibromyalgia. There is nothing in the medical records that documents findings of a significant change in your conditions that would have kept you from working in your Sedentary occupation. We do recognize that you have several medical conditions; however the review notes that there was no significant change in your condition around the time you stopped working.

There is no evidence of degenerative change in the right knee that would impact Sedentary work. You do not meet the American College of Rheumatology criteria for the diagnosis of fibromyalgia or rheumatoid arthritis. There is no evidence of impaired cardiac function, thyroid function or severe headaches requiring emergent treatment. There is no evidence of an impairing psychiatric condition; a psychiatric

-19-

professional has not been consulted and you have been maintained on a low dose of an antidepressant.

Id. at AR 696, 702.

Plaintiff appealed, id. at AR 588, 851, but during her appeal Plaintiff continued to receive medical treatment. On January 27, 2011, Dr. Carey performed arthroscopy surgery on Plaintiff's right knee. Id. at AR 671. Plaintiff tolerated the procedure well. Id. at AR 672. On February 16, 2011, Plaintiff visited Dr. Steigelfest for a follow-up. Id. at AR 669. Plaintiff's examination revealed that Plaintiff's FMS score was 5/18 and she had no weakness. Id.

In Plaintiff's appeal, the Defendant retained Dr. Brian Peck, board certified in Rheumatology, who performed an independent peer review of Plaintiff's medical records. Id. at 610-16, 850, 852. On April 11, 2011, after his review of Plaintiff's medical records, Dr. Peck opined:

**LIKELY DIAGNOSIS**

1. Hypothyroidism, treated.
2. Mild lumbar spondylosis.
3. Mild right patello-femoral OA [osteoarthritis].
4. S/p right knee arthroscopy.
5. S/p cholecystectomy.
6. Gastritis, esophagitis, and esophageal stricture.
7. Myofascial pain syndrome without fulfilled criteria for FMS [fibromyalgia syndrome].
8. False positive ANA with no evidence of SLE [systemic lupus erythematosus] or other CTD [connective tissue disease].

Id. at AR 614. Dr. Peck answered Defendant's referral questions as follows:

**REFERRAL QUESTIONS:**

1. "What medical conditions are supported by this information?"

A: See LIKELY DIAGNOSES above. Specifically excluded are SLE, FMS, and syncope, at least according to the medical records I was asked to review.

-20-

2. "Are there any inconsistencies in the diagnosis, treatment, and claimed impairment?"

A: Yes, there are inconsistencies in the diagnosis, treatment, and claimed impairment. The claimant does not fulfill the diagnostic criteria for SLE. Despite this, she has reported SLE as a given diagnosis to every physician she has seen. The claimant does not fulfill the diagnostic criteria for FMS. Despite this, she has reported FMS as a given diagnosis to every physician she has seen.

3. "Has the claimant had appropriate treatment?"

A: Yes, the claimant has had appropriate treatment, insofar as most of her treatment has been in the form of diagnostic studies and little of it has been in the form of aggressive or invasive tests or procedures. For example, the internal derangements of her knee were treated conservatively, until she felt that she needed a procedure. She did not have a cardiac catheterization for her chest pain until she was ready for it and her chest pain had remained undiagnosed. For suspected but unproven SLE she did not receive steroid therapy.

4. "If not, what would the appropriate treatment be?"

A: N/A.

5. "Please outline the claimant's R and Ls [restrictions and limitations] for the period 2/18/09 through the present."

A: The claimant's R and Ls for the period 2/18/09 through the present are those outlined for light work, as defined in the DOL-DOT. The claimant is capable of light work on a full time basis. The restriction to light work is due to the fact that the claimant has internal derangements of her knees, lumbar spondylosis, and myofascial pain syndrome.

6. "Are the R and Ls provided by the treating physician supported?"

A: The R and Ls provided by the treating physicians are not supported. The R and Ls provided by the treating physicians are far too restrictive and in no case do the physicians' notes correlate with the actual medical evidence of impairment, including the notes in the doctors' own records.

7. "Is there evidence of symptom magnification, exaggeration, or secondary gain?"

A: The symptoms reported are out of proportion to the medical evidence.

Id. at AR 614-616.

-21-

On May 19, 2011, Defendant denied Plaintiff's second appeal and upheld its denial of LTD benefits, stating that "the clinical evidence in [the] file does not support restrictions and limitations due to either a functional or a psychological impairment that would preclude her from performing her regular occupation and does not support a continuous, ongoing disability." Id. at AR 588, 591.

## II. Conclusions of Law

Under ERISA, judicial review of the denial of benefits under ERISA is "*de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If the language of the plan grants the plan administrator discretionary authority to determine eligibility for benefits or to construe plan terms, then the arbitrary and capricious standard applies. Id.; Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir. 1996). For the arbitrary and capricious standard of review, the plan must contain "'a clear grant of discretion [to the administrator] to determine benefits or interpret the plan.'" Perez v. Aetna Life Ins. Co., 150 F.3d 550, 555 (6th Cir. 1998) (en banc) (quoting Wulf v. Quantum Chem. Corp., 26 F.3d 1368, 1373 (6th Cir. 1994) (emphasis in original)).

Here, the plan grants United of Omaha Life the discretion and authority to determine eligibility for STD and LTD benefits and to construe and interpret all terms and provisions of the Policy.

### Authority to Interpret Policy

The Policyholder has delegated to Us the discretion to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy. Benefits under the Policy will be paid only if We decide, after exercising Our discretion, that the Insured Person is entitled to them. In making any decision, We may rely on the

-22-

accuracy and completeness of any information furnished by the Policyholder, an Insured Person or any other third parties.

(Docket Entry No. 11, at AR 579).

This language in the Plan is sufficiently clear and express to grant discretionary authority to Defendant to decide claims for Plan benefits. See Univ. Hosps. of Cleveland v. Emerson Elec. Co., 202 F.3d 839, 846 (6th Cir. 2000) (applying the arbitrary and capricious standard where that plan provided that the plan's administrator "'shall have the discretionary authority to determine eligibility for benefits or to construe the terms of the Plan'"). Accordingly, the Court concludes that the "extraordinarily lenient" arbitrary and capricious standard of review applies here, which "requires only that the claim fiduciary's decision be 'rational in light of the plan's provisions.'" Nicholas v. Standard Ins. Co., 48 F. Appx 557, 564 (6th Cir. 2002) (quoting Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir.1988)).

To withstand judicial review under the arbitrary and capricious standard, an administrator's decision must be "based on a reasonable interpretation of the plan," Shelby Cnty Health Care Corp. v. Southern Council of Indus. Workers, 203 F.3d 926, 933 (6th Cir. 2000), and it must be "'possible to offer a reasoned explanation, based on the evidence, for a particular outcome.'" Evans v. Unum Provident Corp., 434 F.3d 866, 876 (6th Cir. 2006) (quoting Perry v. United Food & Commercial Workers Dist. Unions 405 & 422, 64 F.3d 238, 241 (6th Cir. 1995) (internal quotation marks omitted)). The Court's review "'inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issue.'" Id. (quoting McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003)). The administrator's decision will be upheld "'if it is the result of a deliberate principled reasoning process, and if it is supported by

-23-

substantial evidence.'" Id. (quoting Baker v. United Mine Workers of America Health & Retirement Funds, 929 F.2d 1140, 1144 (6th Cir. 1991) (internal quotation marks omitted)).

Although "the arbitrary and capricious standard is the least demanding form of judicial review," Hunter v. Caliber Sys., Inc., 220 F.3d 702, 710 (6th Cir. 2000) (citation and internal quotation marks omitted), the Sixth Circuit has clearly stated that it is not the equivalent of total deference to plan administrators:

> [M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious . . . standard does not require us merely to rubber stamp the administrator's decision." Jones v. Metropolitan Life Ins. Co., 385 F.3d 654, 661 (6th Cir. 2004) (citing McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003). Indeed, "[d]eferential review is not no review, and deference need not be abject." McDonald, 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." Id.

Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005). As a general rule, the administrator's written decision and the information in the administrative record are the bases for judicial review. Peruzzi v. Summa Medical Plan, 137 F.3d 431, 433-34 (6th Cir. 1998).

On the issue of conflict of interest in ERISA cases, the Sixth Circuit has recognized that a conflict of interest exists "when the insurer both decides whether the employee is eligible for benefits and pays those benefits." Evans, 434 F.3d at 876 (citing Gismondi v. United Techs. Corp., 408 F.3d 295, 299 (6th Cir. 2005)). In Evans, the Sixth Circuit synthesized a definition of this conflict for ERISA purposes, stating:

> "[T]here is an actual, readily apparent conflict . . . not a mere potential for one" where a company both funds and administers [the policy] because "it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the

-24-

denial or discontinuation of benefits." . . . [B]ecause [the] defendant maintains such a dual role, "the potential for self-interested decision making is evident."

Id. (citations omitted). Given Defendant occupies such a dual role, "the potential for self-interested decision-making is evident." Univ. Hosps. of Cleveland, 202 F.3d at 846 n.4. Because the payment of STD and LTD benefits will involve substantial funds, the Court concludes that the Defendant has a conflict of interest in this action.

Yet, "this conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious." Evans, 434 F.3d at 876 (citing Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston, 419 F.3d 501, 506 (6th Cir. 2005)). "The reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision." Id. (citing Carr v. Reliance Standard Life Ins. Co., 363 F.3d 604, 606 n. 2 (6th Cir. 2004)).

Defendant contends that Plaintiff fails to provide objective medical evidence of a disabling condition, supporting her self-reported symptoms. Courts have held that an ERISA administrator's reliance on the lack of objective medical evidence is arbitrary and capricious where the claimant's illness or sickness cannot be objectively determined. As the Sixth Circuit aptly stated in an ERISA action: "As many courts have observed, pain often evades detection by objective means." Brooking v. Hartford Life & Accident Ins. Co., 167 Fed.Appx. 544, 549 (6th Cir. 2006); see also Kosiba v. Merck & Co., 384 F.3d 58, 61 n.3 (3d Cir. 2004) (fibromyalgia); Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) (fibromyalgia). Yet, the Sixth Circuit has also established that medical

-25-

evidence of a diagnosis of such a condition is necessary to find a disability from such an illness. Yeager, 88 F.3d at 381-82.

Hayden diagnosed Plaintiff as having fibromyalgia, lupus, and osteoarthritis, which cause considerable muscle and joint pain. Yet, Plaintiff concedes that her ailments have evaded a clear diagnosis and admits that "[i]t is not clear whether she meets the American College of Rheumatology (ACR) criteria for fibromyalgia syndrome, which formerly required, inter alia, 11 out of 18 relevant 'tender points' for diagnosis of the condition."[1]  (Docket Entry No. 22 at 2-3).  At most, Dr. Steigelfest observed 10 out of 18 tender points.

Although Plaintiff is not required to provide objective evidence of the illnesses themselves, Plaintiff must prove that she has a disability that prevents her from performing "at least one of the Material Duties of [Plaintiff's] Regular Occupation on a part-time or full-time basis." (Docket Entry No. 11 at AR 580).  The Sixth Circuit has stated:

> A claimant could certainly find burdensome a requirement that she proffer objective evidence of fibromyalgia itself, the symptoms of which are largely subjective. But objective evidence of *disability* due to fibromyalgia can be furnished by a claimant without the same level of difficulty. *See Boardman v. Prudential Ins. Co.,* 337 F.3d 9, 16-17 n. 5 (1st Cir.2003) ("While the diagnos[is] of . . . fibromyalgia may not lend [itself] to objective clinical findings, the physical limitations imposed by the symptoms of such illness[ ] do lend themselves to objective analysis.").

Huffaker v. Metro. Life Ins. Co., 271 Fed. Appx 493, 500 (6th Cir. 2008).

Here, Plaintiff fails to provide any medical record that she is disabled under the terms of the policy.  Dr. Snyder released Plaintiff to full activity, (Docket Entry No. 11, at AR 100), and Dr. Gibson stated that Plaintiff's "chest pain was of noncardiac nature" and that "she would have no

---

[1] The Seventh Circuit cited eleven trigger points as an indication of the presence of fibromyalgia, but the Sixth Circuit has not cited any number. Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996).

work restrictions including driving." Id. at AR 710. Although Hayden initially claimed Plaintiff would be unable to work a full workday, Hayden later informed Defendant that she agreed with Dr. Reeder's conclusion that Plaintiff was not restricted from sedentary work. Id. at AR 702, 855; Docket Entry No. 14-1, at AR 1294. Despite his prior determinations, Dr. Steigelfest expressly acknowledged that he did not do disability evaluations. Id. at AR 855; Docket Entry No. 14-1 at AR 1287.

Moreover, Plaintiff concedes that she has "not clearly proven on the face of the record before the Court," (Docket Entry No. 22 at 19), that she is disabled, but asserts that her claim is wholly dependent on subjective evidence of disability. The LTD policy contains a limitation for Self-Reported Symptoms that provides:

> If your Disability is primarily based on Self-Reported Symptoms, Your benefits will be limited to 24 months while You are insured under the Policy . . .
>
> **Self-Reported Symptoms** means the manifestation of Your condition which You tell Your Physician that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine.

(Docket Entry No. 11, at AR 569) (emphasis added).

Plaintiff argues that the this provision proves that self-reported symptoms are sufficient evidence of disability. The Defendant responds that self-reported symptoms may be used as evidence of illness, but that a claimant must still produce sufficient objective evidence of actual disability resulting from such an illness.

In Cooper v. Life Ins. Co. of N. America, the Sixth Circuit held that "[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable." 486 F.3d 157, 166 (6th Cir.2007) (citing Spangler v. Lockheed Martin Energy Sys., Inc., 313 F.3d 356, 361 (6th

-27-

Cir.2002)). There, the Court stated, "[o]bjective medical documentation of [the claimant's] functional capacity would have assisted [the administrator] in determining whether [the claimant] was capable of performing 'all the material duties of her Regular Occupation,' as required by the [long-term disability plan]'s definition of disability." Id. at 166. Moreover, in Huffaker, the Sixth Circuit cited the Eighth Circuit's holding that a "'plan administrator [can] require objective evidence of a disability, even when the claimant's alleged disability stem[s] from fibromyalgia, so long as the administrator notified the claimant that her file lacked the required objective evidence.'" Huffaker, 271 F. App'x at 500 (quoting Johnson v. Metropolitan Life Ins. Co., 437 F.3d 809, 814 (8th Cir. 2006) ("MetLife notified Huffaker that her file lacked the required objective evidence in its December 22, 2004 letter denying benefits, which stated as its reason for denial: 'There is no medical evidence provided by the treating sources to suggest a significant functional impairment or support the severity of this medical condition to prevent you from performing your job.' Thus, MetLife did not act unreasonably in requiring objective evidence of disability.").

Thus, under the Sixth Circuit precedent objective evidence of disability may be required. Here, Defendant repeatedly requested Plaintiff and Plaintiff's physicians to submit more objective medical evidence of her disability and inability to perform sedentary activities. Plaintiff and her physicians failed to submit sufficient objective evidence of actual disability resulting from such an illness.

As to Plaintiff's claim that Defendant's exclusive reliance upon the opinions of non-examining file reviewers is inadequate to provide a "reasoned explanation" for its decision to deny disability benefits, the Sixth Circuit has recognized that "the failure to conduct a physical examination–especially where the right to do so is specifically reserved in the plan–may, *in some*

-28-

*cases*, raise questions about the thoroughness and accuracy of the benefits determination." <u>Calvert</u> <u>v. Firstar Finance, Inc.</u>, 409 F.3d 286, 295 (6th Cir. 2005) (emphasis added). Yet, in <u>Calvert</u>, where the relevant policy stated that "Liberty, at its own expense, will have the right and opportunity to have a covered person whose injury or sickness is the basis of a claim examined by a physician or vocational expert of its choice," <u>id.</u>, the Court ultimately concluded:

> Although this provision *allows* Liberty to commission a physical examination of a claimant, there is nothing in the plan language that expressly *bars* a file review by a physician in lieu of such a physical exam. We are unpersuaded by Calvert's request that we read such a ban into the plan and, therefore, refuse to reject Dr. Soriano's conclusions on that ground alone.
> Rather, as with the other factors upon which Calvert relies to attack Liberty's decision-making process, we regard Liberty's decision to conduct a file review rather than a physical exam as just one more factor to consider in our overall assessment of whether Liberty acted in an arbitrary and capricious fashion.

<u>Calvert</u>, 409 F.3d at 295 (emphasis in original).

Thus, the fact that Defendant did not perform an examination of Plaintiff is not <u>per</u> <u>se</u> arbitrary and capricious. As in <u>Calvert</u>, there is "nothing in the plain language that expressly *bars* a file review by a physician in lieu of such a physical exam." <u>Id</u>. Defendant retained independent reviewers considered Plaintiff's treating physicians' treatments, assessments and opinions. Further, Defendants' employment of independent expert review and affording Plaintiff an opportunity to respond to the review are indicia of a reasoned decision. <u>Noland v. Prudential Ins. Co. of America</u>, 187 Fed. Appx. 447, 452 (6th Cir. 2006) (finding significant that "Prudential not only conducted an in-house clinical review of Noland's medical records, but employed an outside physician specializing in occupational medicine to conduct an independent review. In addition, Prudential offered Noland's physicians the opportunity to comment on the report which they failed to do."). Moreover, three of

-29-

Plaintiff's own medical providers did not restrict her from performing sedentary work. AR 100, 710, 1294.

For these reasons, the Court concludes that Defendant's motion for judgment on the record (Docket Entry No. 19) should be granted and Plaintiff's motion for judgment on the record (Docket Entry No. 21) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___13th___ day of February, 2013.

WILLIAM J. HAYNES, JR.
United States District Judge